# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
                                    )
DAVID H. SLEDGE,                    )
                                    )
           Plaintiff,               )
                                    )
      v.                            )        Civil Action No. 11-cv-1888 (KBJ)
                                    )
DISTRICT OF COLUMBIA,               )
                                    )
           Defendant.               )
                                    )
```

## MEMORANDUM OPINION

Plaintiff David H. Sledge ("Plaintiff" or "Sledge") is an African-American police officer in the District of Columbia's Metropolitan Police Department ("MPD") who has high blood pressure and hypertension. Sledge brought the instant action against the District of Columbia ("Defendant" or "the District"), alleging that MPD officials subjected him to race discrimination, retaliation, and a hostile work environment in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, and that the District is also liable under Section 1983 for violating his Fifth Amendment right to equal protection. (*See* Compl., ECF No. 1, ¶¶ 64-121.) The gravamen of Sledge's complaint is that his supervisor, Assistant Chief of Police Diane Groomes, has long discriminated and retaliated against him on the basis of his race and medical condition—primarily by singling him out for heightened scrutiny and harsher discipline. (*Id.* ¶¶ 45-48, 66-81.) In addition, Sledge faults the District for failing to act on his prior complaints regarding Groomes's alleged acts of discrimination. (*Id.* ¶¶ 53-54.)

Before this Court at present is Defendant's motion for summary judgment. (Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 24.) Defendant maintains that

Sledge has failed to show that the District's legitimate, non-discriminatory reason for disciplining Sledge is pretext for discrimination or retaliation, and that there is no record evidence to demonstrate either the causation necessary to sustain Sledge's retaliation claim or that Sledge was subjected to a hostile work environment. Additionally, Defendant argues that Sledge has failed to demonstrate a basis for municipal liability with respect to his Section 1983 claim. This Court agrees that the District is entitled to summary judgment on all of Sledge's claims; accordingly, Defendant's motion for summary judgment will be **GRANTED**. A separate order consistent with this opinion will follow.

## I.     BACKGROUND

This case primarily arises out of a series of events in February of 2009 involving Sledge and Groomes, which are recounted below and are undisputed unless otherwise noted.[1] As mentioned, Sledge is an African-American police officer who has worked as an officer of the MPD since 1985 and has held the rank of captain since 2007. (*See* Compl. ¶ 11; *see also* Dep. of David Sledge ("Def.'s Sledge Dep."), ECF No. 25-1, at 5-6.)[2] Sledge's medical condition—hypertension and high blood pressure—has

---

[1] Many of the facts have been culled from exhibits to the parties' memoranda that were filed in this Court under seal. (*See* May 2008 Request for Administrative Leave to Attend Outside Training, ECF No. 26-1; Request for Administrative Leave, ECF No. 26-2; Notice of Proposed Adverse Action, ECF No. 26-3; Final Notice of Adverse Action, ECF No. 26-4; Letter of Chief of Police Cathy Lanier dated July 29, 2009, ECF No. 26-5; Investigation with Recommendations Regarding Neglect of Duty by Captain David Sledge, ECF No. 26-6; Letter of Chief of Police Cathy Lanier dated Apr. 26, 2010, ECF No. 26-7; Sledge Performance Evaluation, ECF No. 26-8; June 2008 Request for Administrative Leave to Attend Outside Training, ECF No. 26-10; Order of Dismissal Regarding Appeal of Non-Performance-of-Duty, ECF No. 26-11; Mem. Regarding Sledge's Demotion Appeal, ECF No. 33-1; Decision on Sledge's Demotion Appeal, ECF No. 33-2.) In their unsealed briefs on the instant motion, the parties have referenced and quoted from portions of these exhibits, and this Court has done the same in this opinion. However, the documents themselves will remain sealed in their entirety on the docket until further notice.

[2] Page numbers throughout refer to the numbers that the Court's electronic filing system assigns. In addition, the Court notes that both parties have submitted excerpts of Sledge's deposition. Defendant's

interfered with his ability to work at times, requiring him to take sick leave.  (*See* Def.'s Sledge Dep. at 4.)

In April of 2008, Sledge's immediate supervisor, Commander Joel Maupin ("Maupin"), and his second-level supervisor, Groomes, appointed Sledge to serve as "administrative captain."  (*Id.* at 2; Def. District of Columbia's Stmt. of Material Facts as to which there is No Genuine Issue ("Def.'s Facts"), ECF No. 24, at 3-6, ¶ 3).  In this capacity, Sledge was responsible for assigning officers to criminal investigations; monitoring the assignees' timeliness, progress, and completion of tasks; and reviewing administrative correspondence.  (Role of Admin. Cpt., ECF No. 25-2, at 1; Pl.'s Sledge Dep., ECF No. 31-3, at 18.)  At the time of the appointment, Sledge and Maupin worked at MPD's Seventh District headquarters in the Southeast quadrant of the District of Columbia, while Groomes was stationed in Northwest D.C.  (Def.'s Facts ¶ 3.)

By all accounts, the administrative captain position involved a significant amount of extra work for Sledge.  (*See* Pl.'s Sledge Dep. at 12-15.)  In June of 2008, two months into his service as administrative captain, Sledge requested leave to attend a week-long training program, but Maupin denied the request on the ground that Sledge was too far behind on work-related tasks.  (*See* Request for Training, ECF No. 26-1, at 1-2; Pl.'s Sledge Dep. at 25; *see also* Denial Letter, ECF No. 26-2, at 1.)  According to the complaint, in the fall of that same year, Sledge "began to complain to management regarding the discrimination he believed he was being subjected to."  (Compl. ¶ 21.)

excerpts are referred to throughout as "Def.'s Sledge Dep.," while the excerpts that Sledge submitted are referred to as "Pl.'s Sledge Dep."

<u>Sledge's Neglect Of Duty Charge</u>

While serving as administrative captain, Sledge briefly took on an additional role: Maupin assigned Sledge to serve as Acting Commander of the Seventh District for one week—from Wednesday, January 28, 2009, until Wednesday, February 4, 2009—while Maupin was out on leave. (Groomes Inv. Report, ECF No. 26-6, at 1.) Over the weekend during this assigned period, there were two shooting homicides and a stabbing incident in the Seventh District. (*Id.* at 1.) The precinct called Sledge at home and sent him emails directing him to return to work immediately in order to oversee the investigations. (*Id.* at 1-2.) Sledge did not respond to the calls or the emails, nor did he oversee the homicide and stabbing investigations, and he did not return to work until Monday, February 2nd. (*Id.*) In addition, according to Groomes, Sledge was unable to apprise his supervisors sufficiently at a briefing session upon his return. (*Id.* at 2 (providing examples of specific questions that Sledge was unable to answer).) For his part, Sledge has admitted that he was absent over the weekend, but also has insisted that the captain who was on duty at the time should have been held responsible. (*See* Pl.'s Sledge Dep. at 75-76.) In addition, Sledge disputes Groomes's characterization of his briefing performance: Sledge maintains that he answered every question he was asked during the session, despite the fact that Groomes "scream[ed] and holler[ed] at [him], and just humiliated [him] in front of everybody" present. (Pl.'s Sledge Dep. at 79.)

At the end of the briefing session, Groomes assigned Sledge several tasks, including writing a report that was due the following day. (*See* Groomes Inv. Report at 2.) Shortly after the meeting, Groomes followed up with e-mails requesting the report even sooner—by later that same afternoon. (*See* Pl.'s Sledge Dep. at 79-80; Groomes

Inv. Report at 2.) It is undisputed that Sledge did not complete the report or the other assigned tasks. Instead, he left the office after he began to feel ill, and went to the police officer's clinic, which placed him on sick leave due to hypertension-related symptoms. (Pl.'s Sledge Dep. 80-83; Groomes Inv. Report at 4-5.) Sledge did not tell Groomes that he was leaving the office, but he did speak with Maupin, who was out of town at the time. (*See* Groomes Inv. Report at 2-3.) In their brief phone call, Sledge told Maupin that he was leaving the office due to illness and asked Maupin to send in a replacement; Maupin denied the request. (*See id.*; *see also* Pl.'s Sledge Dep. at 82-83.) The parties dispute whether Sledge told Maupin that he had pressing assignments due to Groomes. (*Compare* Groomes Inv. Report. at 2-3 (noting that Sledge never told Maupin about the outstanding reports), *with* Pl.'s Sledge Dep. at 82-84 (contending that he told Maupin about the reports).) In any event, Sledge asked a lower-ranking officer to complete the tasks for him, and it is undisputed that the officer did not finish the work. Sledge did not return to the office until February 17, 2009; from Groomes's perspective, Sledge's sudden absence for fifteen days resulted in the failure to address "numerous issues and requested items[.]" (Groomes Inv. Report at 3.)

In the wake of Sledge's weekend absence, unexpected and generally unannounced departure from work during the following week, and incomplete assignments, Groomes initiated an administrative investigation into Sledge's conduct. (*See id.*; *see also* EEOC Intake Questionnaire, ECF No. 25-5, at 6.) This investigation commenced on February 3, 2009, and concluded on February 21, 2009, and involved collecting statements from officers with knowledge of the pertinent events, such as Sledge, Maupin, and the lower-ranking officer Sledge asked to fill in for him.

(Groomes Inv. Report at 4-9; EEOC Intake Questionnaire at 6.)  Upon completing her investigation, Groomes issued a report recommending that Sledge be disciplined for neglect of duty.  (*See* Groomes Inv. Report at 14 (recommending that Sledge "be cited for adverse action" but not suggesting a particular course of action).)  The bases for the suggested disciplinary action were:  (1) Sledge's failure to report to duty on Sunday, February 1st; (2) Sledge's failure to respond sufficiently to the homicide incidents and to prepare for the briefing session; (3) Sledge's failure to complete priority assignments or to ensure that they were otherwise completed; and (4) Sledge's failure to notify Groomes that he was leaving the office due to illness.  (*Id.* at 13-14.)

Groomes's neglect-of-duty report made its way through MPD's administrative channels.  On March 2, 2009, the chief of MPD's Internal Affairs Division concurred with Groomes's report and recommendation.  (*See* EEOC Intake Questionnaire at 6.)  An MPD Disciplinary Review Officer then reviewed Groomes's investigative report, concurred with the findings, and recommended that Sledge be demoted to the rank of lieutenant.  (*Id.*)  The MPD served Sledge with a Notice of Proposed Adverse Action for Demotion on April 13, 2009.  (*See* ECF No. 26-3, at 1-2.)  Days later, Sledge filed a formal response in which he denied the charge and contended *inter alia* that the responsibility for the failure to complete the assignments should not lie with him.  (*See* Final Notice of Adverse Action, ECF No. 26-4, at 1-2 (referencing Sledge's response); *see also* EEOC Intake Questionnaire at 7 (same).)  Upon review, the MPD disagreed with Sledge and concurred with the earlier finding that he was remiss in his duties and that the neglect-of-duty charge was warranted.  (Final Notice of Adverse Action at 2,

4.)  Sledge received a Final Notice of Adverse Action informing him of his demotion on June 24, 2009.  (*Id.* at 1.)

Pursuant to MPD regulations, Sledge then appealed the decision to the Chief of the MPD, Cathy Lanier.  (*See* Letter of Chief of Police Cathy Lanier dated July 29, 2009, ECF No. 26-5, at 1.)  While that appeal was pending, Sledge received his first ever negative performance evaluation.  (*See* EEOC Intake Questionnaire at 2.)  By letter of July 29, 2009, Chief Lanier upheld the neglect-of-duty finding but reduced the punishment:  instead of demotion, the Chief imposed a twenty-day suspension without pay, ten days of which would be held in abeyance for one year.  (*Id.* at 9.)  According to Sledge, this punishment prevented him from being eligible for a promotion for the next three years.  (*See* Pl.'s Sledge Dep. at 58 (explaining that an officer cannot be appointed to a higher-ranking position within three years of any disciplinary actions).)

EEO Complaints

Groomes's neglect-of-duty investigation was still in its early stages when Sledge, who was out on sick leave, met with Assistant Chief of Police Alfred Durham to complain that Groomes had been discriminating against him.  The meeting took place on February 12, 2009, and Sledge maintained that Groomes had created a hostile work environment for him because of his hypertension and use of sick leave.  (*See* EEOC Intake Questionnaire at 5.)  Later that same day, Sledge met with MPD's EEO administrator Nicole Webster and made the same report.  (*Id.*)  In reflecting on these two meetings later, Sledge could not specifically recall mentioning race discrimination to either Durham or Webster.  (*See* Pl.'s Sledge Dep. at 22 (Plaintiff "cannot recall" whether he mentioned race discrimination to Webster on February 12, 2009); *id.* at 29

(Sledge asserts that he spoke to Durham about Groomes on February 12, 2009, without any reference to having discussed race discrimination); *id.* at 30 (with respect to Durham, "I believe I told him that [Groomes] was singling me out"); EEOC Intake Questionnaire at 5 (Sledge describes his February 12, 2009, reports to Webster and Durham as complaining of disability discrimination); *but see* Pl.'s Sledge Dep. at 30 (with respect to the meeting with Durham, Sledge "believe[d]" he mentioned "the racial issue also").)

These February 2009 complaints to Durham and Webster were not Sledge's first time reporting Groomes's alleged mistreatment of him. According to Sledge, he first complained to Maupin about Groomes in November of 2008, and at that time, Sledge purportedly told Maupin that Groomes had been "discriminating against [him] racially." (Pl.'s Sledge Dep. at 22, 26-28.) Sledge maintains that he also complained to Chief Lanier about Groomes over the next year (EEOC Intake Questionnaire at 5); however, there is nothing in the record that establishes Sledge ever mentioned race discrimination in his complaint to Chief Lanier.

On March 3, 2009, Sledge formally filed his first EEO complaint, alleging that he had "been discriminated against based on [his] disability, in violation of the [ADA.]" (Mar. 3, 2009, Charge of Discrimination ("March Charge of Discrimination"), ECF No. 25-3, at 1.)[3] Specifically, Sledge contended that Groomes's neglect-of-duty investigation constituted discrimination based on his disability and use of sick leave, and was initiated in retaliation for his having reported her to Durham on February 12, 2009. (*See id.* at 1.) Sledge also noted that he had requested to be transferred and

---

[3] The written charge of discrimination that was served on the MPD is dated March 17, 2009, but the parties agree that Sledge went to the EEOC office to file the charge on March 3, 2009. (*See* March Charge of Discrimination at 1.)

removed from Groomes's supervision on several occasions, but his request had not been granted.  (*Id.*)

On November 9, 2009, Sledge returned to the EEOC and completed an "Intake Questionnaire."  (*See* EEOC Intake Questionnaire at 1.)  The Intake Questionnaire is a standard form that includes questions regarding the nature and circumstances of the alleged discrimination; Sledge completed the form by hand.  Apparently seeking to amend his March charge of disability discrimination, at the top of the questionnaire Sledge wrote "AMENDMENT" and the administrative case number of his March charge.  In response to a question asking for a description of the alleged discriminatory actions, Sledge wrote that Groomes and Maupin were engaged in "ongoing" discriminatory acts against him (*id.* at 2); specifically, the "proposal for demotion," "[i]nitiating unwarranted discipline action and heightened scrutiny of work," and "preparing and submitting [a] negative performance report[.]"  (*Id.*)  Sledge also stated that he had sent a memo to Chief Lanier "requesting to be removed from the environment and from under the supervisory control" of Groomes and Maupin, but that his request had been denied.  (*Id.* at 3.)

Sledge attached to the Intake form a letter he had written (also dated November 9, 2009) that was titled "Retaliation and Harassment Complaint."  (*See id.* at 5.)  This narrative largely related to Sledge's retaliation allegations insofar as it recounted Sledge's complaints about Groomes to various authorities and MPD's alleged response—actions that Sledge characterized as "unlawful discrimination, a hostile workplace[,] and retaliation[,]" and attributed to a number of MPD officials, including Durham, Groomes, Maupin, and the officials involved in the neglect of duty

investigation and determination.  (*Id.* at 10.)  For example, Sledge specifically contended that Groomes's investigation and the resulting Notice of Proposed Adverse Action recommending his demotion were retaliation for his filing the March charge of discrimination.  (*Id.* at 7.)  In support of this retaliation contention, Sledge also noted that Groomes had not initiated investigations into other officers who had failed to complete assignments, nor had she recommended any discipline for such officers, and he apparently attached a list of instances of overdue correspondence by other captains that were purportedly similar to the assignments he had failed to complete.  (*See id.* at 9.)[4]  In addition, Sledge described his repeated requests that officials conduct investigations into Groomes and Maupin and that Sledge be removed from their supervision, and he contended that MPD's denial of these myriad requests had created a hostile work environment.  (*See id.* at 7-8.)

Notably, at points during the narrative description that was attached to the Intake Questionnaire, Sledge reiterated his belief that Groomes "was unlawfully discriminating against me because of my chronic hypertension and disability sick leave usage regarding my medical condition."  (*Id.* at 5; *see also, e.g.*, *id.* at 6 (asserting that Groomes's "administrative investigation" was "a pretext . . . to further mask her unlawful discriminatory conduct towards me regarding my chronic medical condition and disability sick leave usage.").)  On the Intake form itself, Sledge checked three boxes in response to a request for an assertion of "the reason (basis) for your claim of employment discrimination":  "race[,]" "disability[,]" and "retaliation[.]"  (*Id.* at 2.)

---

[4] The record in this matter does not include this attachment; however, the narrative that Sledge attached to the Intake form references it. (*See* EEOC Intake Questionnaire at 9.) Without access to that attached document, the Court is unable to determine whether Sledge noted the race of any other officers he purportedly listed, nor is it clear whether the listing contained any specific information about the nature of the purported infractions.

Sledge elaborated on the "disability" basis in a separate section of the form (*id.* at 3), but other than a checkmark in the "race" box as a described, the EEOC Intake Questionnaire form and its attachments make no mention of discrimination on the basis of race.

On November 18, 2009, just ten days after Sledge completed the Intake Questionnaire, the MPD transferred Sledge to a different district. (*See* Email Regarding Transfer, ECF No. 25-6, at 1.) According to Sledge, although he retained his rank as captain, he lost seniority and had to work undesirable midnight shifts as a result of the transfer. (*See* Pl.'s Sledge Dep. at 52-54.)

On December 1, 2009, Sledge returned to the EEOC to file another charge of discrimination, this time specifically alleging that his treatment by the MPD—including the discipline and related suspension Groomes had initiated, the poor work performance evaluation of July 25, 2009, and his transfer to a different district—constituted disability discrimination and retaliation in violation of the ADA. (Dec. 1, 2009, Charge of Discrimination ("Dec. Charge of Discrimination"), ECF No. 25-7, at 1.) The EEOC issued a second "Notice of Charge of Discrimination" on December 2, 2009, informing the MPD of Sledge's new complaint. (*See* Notice of Charge of Discrimination, ECF No. 25-8, at 1.) According to Defendant, the EEOC mailed a copy of Sledge's November Intake Questionnaire along with that December notice. (Def.'s Mot. at 10.)

On January 21, 2010, Sledge met with MPD's Internal Affairs Department and informed staff in that office that he intended to file another EEO action in this matter. (*See* Pl.'s Answers to the District's Interrogs. ("Pl.'s Interrog. Resps."), ECF No. 31-4, at 30.) Four days later, an officer in the Medical Claims review division dismissed

Sledge's appeal of a disability claim that he had filed a year earlier. (*See* Order of Dismissal Regarding Appeal of Non-Performance-of-Duty, ECF No. 26-11, at 1.) As rationale for dismissal of the appeal, the Medical Claims review division stated that it had construed Sledge's failure to report for scheduling hearings as a withdrawal of the appeal. (*See id.* at 2.) Later that same month, Maupin completed a performance review of Sledge (*see* Sledge Performance Evaluation, ECF No. 26-8), which Sledge contends was a negative performance review. Specifically, Maupin rated Sledge as a "valued performer," *id.*, while he had previously received a higher overall rating of "highly effective performer[.]" (*See* Def.'s Mot. at 25.)

The Instant Litigation

The EEOC issued Sledge a right-to-sue letter on July 26, 2011 (Compl. ¶ 8), and Sledge filed the instant complaint in federal court on October 25, 2011. In Count I, Sledge alleges that he was subjected to discrimination and a hostile work environment due to his race in violation of Title VII of the Civil Rights Act. (*Id.* ¶¶ 64-81.) In Count II, Sledge alleges that he was subject to materially adverse actions (*i.e.*, retaliation) and a hostile work environment in response to his earlier protected EEO activity, also in violation of Title VII. (*Id.* ¶¶ 82-99.)[5] In addition, in Count IV, Sledge alleges a Section 1983 claim, stating that the District "denied Plaintiff equal protection of the laws under the Fifth Amendment" as a result of the alleged discriminatory conduct of the MPD officers, and that the city is "directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course

---

[5] The jurisdictional statement in the complaint also lists the D.C. Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401.01 *et seq.*, as the statutory basis for Sledge's claims, but the counts themselves do not reference the DCHRA at all. (*Compare* Compl. ¶ 3, *with id.* ¶¶ 64-99.)

and scope of their employment, under the theory of *Respondeat Superior*." (*Id.* ¶¶ 118, 119 (emphasis in original).)[6]

The District filed the instant motion for summary judgment at the close of discovery on December 13, 2013. (*See* Def.'s Mot. at 34.)

## II.   LEGAL STANDARD

The Court must grant a motion for summary judgment if the moving party demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Initially, the moving party has the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the non-moving party must designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324. While the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor, *see, e.g.*, *Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 23-24 (D.C. Cir. 2013), the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in

---

[6] Plaintiff's original complaint also included a race discrimination claim under Section 1981 of Title 42 of the U.S. Code (Count III), but the Court dismissed this claim previously because a plaintiff cannot assert a private right of action against a state actor under Section 1981. *See Sledge v. District of Columbia*, 869 F, Supp. 2d 140, 144-45 (D.D.C. 2012).

support of" his or her position; instead, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252. Moreover, the non-moving party "may not rest upon mere allegation or denials of his pleading but must present affirmative evidence showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (internal quotation marks and citation omitted).

It is well established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (citation omitted). Indeed, a court's role in deciding a summary judgment motion is not to "determine the truth of the matter, but instead [to] decide only whether there is a genuine issue for trial." *Id.* (citation omitted). Moreover, "the potential difficulty for a plaintiff in an employment discrimination or retaliation action to uncover clear proof of discriminatory or retaliatory intent" warrants caution, *Nurriddin v. Bolden*, No. 04-2052, 2014 WL 1648517, at *5 (D.D.C. Apr. 25, 2014) (citation omitted); therefore, in determining whether there are genuine issues of material fact for trial, the Court reviews a defendant's motion for summary judgment with a slightly "heightened standard[.]" *Walker v. England*, 590 F. Supp. 2d 113, 133 (D.D.C. 2008) (citation omitted). Nevertheless, despite the fact that "summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of his obligation to support his allegations" with competent evidence showing a genuine issue for trial. *Id.* at 132-33 (quoting *Morgan v. Fed. Home Loan. Mortg. Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001)); *see also Marshall v. James*, 276

F. Supp. 2d 41, 47 (D.D.C. 2003) (noting that, even though courts must proceed with caution, summary judgment is still used in discrimination cases).

## III. ANALYSIS

### A. Sledge's Title VII Race Discrimination Claim (Count I)

Sledge first contends that the MPD subjected him to discrimination due to his race. (Compl. ¶¶ 64-81.) Because there is no genuine issue of fact regarding whether the District's non-discriminatory rationale for the challenged actions was mere pretext for discrimination (Sledge has not offered sufficient evidence to support the conclusion that that it is), this Court finds that Sledge's race discrimination claim cannot survive the District's motion for summary judgment.

#### 1. Framework For Establishing Race Discrimination

Title VII prohibits federal agencies from discriminating against their employees based on certain protected characteristics, including race. *See McGrath v. Clinton*, 666 F.3d 1377, 1379 (D.C. Cir. 2012) (citing 42 U.S.C. § 2000e-16(a)). It is well settled that, for Title VII purposes, "[t]here are 'two elements for an employment discrimination case: (i) the plaintiff suffered an adverse employment action (ii) because of the employee's race, religion, sex, or national origin.'" *Perry v. Shinseki*, 783 F. Supp. 2d 125, 133 (D.D.C. 2011) (quoting *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008)).

As a general matter, plaintiffs may establish that they have suffered adverse employment consequences based on a protected characteristic in two ways. First, a plaintiff might opt to employ the "pretext" framework (otherwise known as the "single motive" approach), and thereby demonstrate that the employer's proffered reason for

the employment action was a pretext for discrimination. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Alternatively, a plaintiff might choose to employ a "mixed motive" framework that allows a plaintiff to show that a protected criterion, such as race, was a "motivating" or "substantial" factor in the challenged employment action. *See Perry v. Shinseki*, 783 F. Supp. 2d 125, 133 (D.D.C. 2011) (citations omitted); *see also Ginger v. District of Columbia*, 527 F.3d 1340, 1345 (D.C. Cir. 2008)("In a mixed motive case, but not in a single motive case, it is a partial affirmative defense that the employer would have taken the same action even 'in the absence of the impermissible motivating factor'; [and] in such a case the plaintiff is entitled only to a declaratory judgment, limited injunctive relief, and attorney's fees." (citations omitted)). So long as evidence supports both the "pretext" and "mixed motive" theories, the plaintiff need not elect a single theory of discrimination, and instead may argue that both apply. *See Ponce v. Billington*, 679 F.3d 840, 845 (D.C. Cir. 2012) ("Even though we have described but-for and mixed-motive cases as 'alternative ways of establishing liability, a plaintiff may proceed under both theories simultaneously." (citations omitted)); *see also Nuskey v. Hochberg*, 730 F. Supp. 2d 1, 3 (D.D.C. 2010). However, the D.C. Circuit has cautioned that "at some point [the plaintiff] must place the employer and court on notice as to the theory or theories under which he intends to proceed." *Ponce*, 679 F.3d at 845 (citing *Ginger*, 527 F.3d at 1345).

Nowhere in the instant complaint or in his briefs does Sledge make the argument that his race was one of several "motivating" or contributing factors for Groomes's treatment of him, including her decision to investigate him and request that he be

disciplined. To the contrary, Sledge repeatedly argues that MPD's stated rationale for taking adverse action against him (*i.e.*, his own job-performance failures) was entirely false and, accordingly, was pretext for discrimination. (*See* Compl. ¶¶ 62, 70; Pl.'s Opp'n to the District's Mot. for Summ. J. ("Pl.'s Opp'n"), ECF No. 31, at 29.) Under D.C. Circuit precedent, a plaintiff is required to make the specific argument that race was a "motivating factor" if he desires for the court to consider a mixed-motive theory when ruling on a summary judgment motion, *see Ponce*, 679 F.3d at 845 (discussing *Ginger*, 527 F.3d at 1345); and indeed, even when the plaintiff "might have had a compelling case had [he] argued race was one of multiple motivating factors[,]"*Ginger*, 527 F.3d at 1345, a court need not consider any mixed motive argument if the plaintiff has not made one, *see, e.g.*, *Ponce*, 679 F.3d at 845. Here, because Sledge has opted to proceed solely down the single motive (pretext) path, this Court has evaluated the instant summary judgment motion only with an eye toward whether Sledge has proffered sufficient evidence to demonstrate that the District's proffered reason for its disciplinary action was pretextual. *See Ponce*, 679 F.3d at 845; *Ginger*, 527 F.3d at 1345.

Courts traditionally analyze pretext arguments in Title VII employment discrimination cases under the familiar three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green. See* 411 U.S. at 802-03.[7] However, the D.C. Circuit has clarified that the court's analysis of the first step of this framework—*i.e.,*

---

[7] Under the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case of discrimination. *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (citation omitted). If the plaintiff establishes a prima facie case, the burden shifts to the employer to assert a legitimate, non-discriminatory reasons for its actions. *Id.* (citation omitted). If the employer produces such a reason, then the court looks to whether a reasonable jury could infer discrimination based on all of the evidence, including the prima facie case, the employer's rationale, and any other evidence. *Id.* (citation omitted).

whether or not the plaintiff has established a prima facie case—is "almost always irrelevant" and "a largely unnecessary sideshow." *Brady*, 520 F.3d at 492, 494. Thus, where, as here, the defendant employer has asserted a legitimate, non-discriminatory reason for an employment decision, there is "one central question" that the district court must resolve: whether the employee has produced "sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on [an improper] basis[.]" *Id.* at 494. In other words, the ultimate factual issue is "whether the employee produced sufficient evidence for a reasonable jury to find the employer's justifications for the challenged action are merely pretext for underlying, unlawful discrimination." *Byrd v. District of Columbia*, 807 F. Supp. 2d 37, 72 (D.D.C. 2011) (citing *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009)). In making this determination, the court considers "all of the evidence, taken together[.]" *Jones*, 557 F.3d at 678. The evidence may include testimony from the decision-maker involved and other employees, comparative evidence suggesting that the employer treated other employees of a difference race more favorably in the same factual circumstances, or any other evidence suggesting the employer is "making up or lying about the underlying facts that formed the predicate for the employment decision." *Brady*, 520 F.3d at 495.

2. <u>Sledge Has Failed To Offer Sufficient Evidence To Support An Inference That The District's Proffered Reason For The Disciplinary Action Was Pretextual</u>

Sledge alleges that the administrative investigation, severe discipline, and poor work performance evaluation that he received were all the result of race discrimination. (*See* Pl.'s Opp'n at 28-29.) The District has asserted a legitimate, non-discriminatory

reason for these adverse employment actions; namely, that Sledge failed to meet the requirements of his job when (a) he did not come to work to oversee three important investigations, (b) he did not know enough about the investigations to brief his supervisors adequately, and (c) he left the office without taking precautions to ensure that the priority tasks that had been assigned to him would be completed in his absence. (*See* Def.'s Mot. at 12-14.)  Under *Brady* and its progeny, the question for this Court is whether Sledge has produced evidence that is sufficient for a reasonable jury to find that the MPD's stated reason was not the actual reason for the actions taken, and that, instead, the MPD intentionally discriminated against Sledge based on his race.  *See Brady*, 520 F.3d at 495.

The District has submitted pages of evidence describing Sledge's purportedly deficient conduct—chief among this evidence is Groomes's investigative report detailing the incidents of February 2009.  (*See* Groomes Inv. Report at 1-3.)  Notably, this report was based both on Groomes's own participation in the incident (in particular, her role as Sledge's commanding officer) and also on statements from Sledge and four other involved officers.  (*See id.* at 4.)  For his part, Sledge does not deny that he failed to report for work on the day of the homicides, that he deferred to another officer during the briefing session, and that one of the priority reports he was responsible for was never completed.  Instead, Sledge's primary argument for discrediting the District's asserted non-discriminatory reason for its actions is that he was disciplined more severely than any White officers had been for allegedly analogous misconduct.  (*See* Pl.'s Opp'n at 31.)

This Court concludes that Sledge has failed to offer evidence that is sufficient to demonstrate that the legitimate and non-discriminatory reasons that the MPD has provided for its treatment of Sledge were pretext for race discrimination. As an initial matter, Sledge does not contend—and the evidence in no way reflects—that Groomes or anyone else at the MPD made racially-tinged comments or undertook actions that, in and of themselves, suggested race bias, either explicitly or implicitly. Instead, Sledge asserts that other (White) officers who were facing neglect of duty charges received more favorable treatment than he did. To support this contention, Sledge points to three pieces of evidence: first, the deposition testimony of MPD officer Michael Eldridge, who stated that he could not recall any other officer he disciplined for failing to submit a homicide report (*see* Dep. of Michael Eldridge ("Eldridge Dep."), ECF No. 31-2, at 13); second, his own testimony identifying two White officers who "had late reports and were not disciplined" (Pl.'s Sledge Dep. at 48-49); and third, a list of the 68 Neglect of Duty charges that the MPD issued to high-ranking officers from 2007 to 2012, which shows that a majority of charged officers were African American, and none of the charged White officers were subject to demotion as punishment (*see* Lieutenants & Above Discipline From 2007 to Present ("Charge Statistics"), ECF No. 31-5, at 1-16). But as explained below, none of these evidentiary bases establishes that these other officers are *meaningful* comparators.

It is well established that, to be successful in the use of comparator evidence, "the plaintiff must point to a *similarly situated* employee outside of a protected class who committed comparable offenses but who was punished less severely by the same deciding official." *White v. Tapella*, 876 F. Supp. 2d 58, 70 (D.D.C. 2012) (emphasis

added) (citing *Cabrera v. United States*, 333 F. App'x 559, 564-65 (Fed. Cir. 2009));
*see also id*. (noting that an employee must "hold the same position as the plaintiff" to be similarly situated). Sledge has not demonstrated that the comparator evidence he proffers in this case meets that requirement. For example, it is not at all clear that the other officers' offenses that were mentioned in the deposition testimony are similar to Sledge's: even though the White officers may have failed to submit assigned reports (*see* Eldridge Dep. at 13; Pl.'s Sledge Dep. at 48-49), Sledge was disciplined for much more than a single failure to submit a required assignment (*see* Eldridge Dep. at 14; Notice of Proposed Adverse Action at 1-2 (Sledge's neglect of duty charge was based on four separate incidences of misconduct)). Likewise, the proffered testimony is devoid of any statements regarding what ranks the other officers held, and the record does not establish that the deciding official in the comparison cases was the same as in Sledge's case—a crucial variable if any legitimate inference regarding intentional discrimination is to be drawn. *See Davis v. Ashcroft*, 355 F. Supp. 2d 330, 344 (D.D.C. 2005); *see also Phillips v. Holladay Prop. Servs., Inc.*, 937 F. Supp. 2d 32, 35 (D.D.C. 1996) (noting that the decision-maker or supervisor must be the same for the employees to be similarly situated), *aff'd*, 1997 WL 411695 (D.C. Cir. June 19, 1997). Sledge's chart listing all Neglect of Duty charges fares no better. Only 22 of the 68 charges on the list involved captains; none of the Neglect of Duty violations appear to have involved a laundry list of "specifications"—*i.e.*, incidents—that are similar to Sledge's; and there is no information about the deciding official. (*See* Charge Statistics at 1-16.) Thus, the list of other Neglect of Duty charges also fails to establish that the cases

involving White officers involved competent comparator evidence.  *See White*, 876 F. Supp. 2d at 70.

The fact that an inference of race discrimination cannot reasonably be drawn from Sledge's comparator evidence is fatal to his Title VII race discrimination claim, because Sledge has not based his pretext assertion on anything else.  Consequently, Defendant is entitled to summary judgment on Sledge's intentional race discrimination claim as a matter of law.

### B.  Retaliation Claim (Count II)

Sledge has also alleged a stand-alone retaliation claim in which he points to many of the same instances of alleged race discrimination and maintains that, as reprisal for his complaints regarding Groomes's alleged discrimination, he suffered a host of adversities, including

> being unjustly disciplined, denial of [a] job-related stress claim, demotion proposed, being unfairly targeted, having his work scrutinized, involuntarily transferred (twice), involuntarily assigned to an undesirable midnight shift, increase of workload despite being on light duty status, having his ideas pertaining to increase in DCMPD work productivity disregarded and denial of extra manpower.

(Compl. ¶ 88.)  For the reasons that follow, the District is also entitled to summary judgment on Sledge's retaliation claim.

### 1.  Framework For Proving Retaliation

To prove a prima facie case of retaliation, a plaintiff must show (1) that he engaged in a statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two.  *Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012) (citation omitted).  With respect to whether the employer's action is "materially adverse" for the purposes of a retaliation

claim, courts consider whether the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Lancaster v. Vance-Cooks*, 967 F. Supp. 2d 375, 386 (D.D.C. 2013). Courts have found that disciplinary investigations and suspensions without pay may be sufficiently adverse to support a retaliation claim. *See, e.g.*, *Baloch v. Kempthorne*, 550 F.3d 1191, 1199-1200 (D.C. Cir. 2008); *Rattigan v. Holder*, 604 F. Supp. 2d 33, 52 (D.D.C. 2009). However, to establish the requisite causal nexus between the protected activity and the employer's materially adverse action, a plaintiff must demonstrate by direct or circumstantial evidence that the employer had actual knowledge of the protected activity and took adverse action against him because of it. *See Jones*, 557 F.3d at 670; *see also Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000); *Lowe v. District of Columbia*, 669 F. Supp. 2d 18, 29-30 (D.D.C. 2009).

Retaliation claims brought under Title VII are subject to the same burden-shifting framework at the summary judgment stage as single-motive discrimination claims. *See Jones*, 557 F.3d at 678; *see also Rattigan v. Holder*, 982 F. Supp. 2d 69, 82 (D.D.C. 2013) ("[A] Title VII retaliation claim cannot rely on a mixed motive theory."). As explained earlier, although the *McDonnell-Douglas* framework applies, the D.C. Circuit has directed district courts to fast forward to the ultimate question of whether all of the evidence, taken together, supports an inference of retaliation when the employer has proffered a legitimate, non-discriminatory reason for the adverse action at issue. *See Jones*, 557 F.3d at 678 (citing *Wiley v. Glassman*, 511 F.3d 151, 155-56 (D.C. Cir. 2007)); *see also Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en

banc)). Accordingly, "the court reviews each of the three relevant categories of evidence—prima facie, pretext, and any other—to determine whether they 'either separately or in combination' provide sufficient evidence for a reasonable jury to infer retaliation." *Jones*, 557 F.3d at 678 (citing *Waterhouse v. District of Columbia*, 298 F.3d 989, 996 (D.C. Cir. 2002)).

      2.  <u>No Reasonable Jury Could Find That Sledge Was Subject To Retaliation In Violation Of Title VII</u>

As explained, to successfully demonstrate retaliation, Sledge must show that he engaged in protected activity and that the MPD subjected him to adverse action because of that activity. *Hamilton*, 666 F.3d at 1357. It is important to note for present purposes that not all of the myriad complaints about Groomes that Sledge allegedly made to various officials throughout the relevant time period qualify as "protected activity" giving rise to an actionable Title VII retaliation claim. This is because, in order to have engaged in a "protected activity" for the purpose of Title VII, a plaintiff must have expressed opposition to "'a practice made an unlawful employment practice' by the statute." *McGrath*, 666 F.3d at 1380 (quoting 42 U.S.C. § 2000e-3(a)). Title VII does not prohibit *disability* discrimination at all—that, of course, is the provenance of the ADA—consequently, complaints of discrimination "based only on [a plaintiff's] purported disability, which is not a characteristic enumerated in Title VII[,]" cannot serve as the statutorily protected activity that underlies a Title VII retaliation claim. *Branscomb v. Sec'y of Navy*, 461 F. App'x 901, 906 (11th Cir. 2012); *see also Omogbehin v. Cino*, 485 F. App'x 606, 611 (3d Cir. 2012) ("A Title VII retaliation claim must [ ] be based upon discrimination made unlawful by Title VII . . . [, which] does not address discrimination based upon disabilities." (citations omitted)). Thus,

any reports and complaints that Sledge made about Groomes's alleged discrimination and retaliation on the basis of his medical condition (without reference to race discrimination) cannot give rise to a retaliation claim under Title VII. *McGrath*, 666 F.3d at 1382.

Unfortunately for Sledge, the record evidence establishes clearly that the vast majority of his complaints about Groomes were allegations that Groomes singled him out as a result of his hypertension, high blood pressure, and use of sick leave—and therefore, related to *disability* discrimination only. (*See* Pl.'s Sledge Dep. at 4, 22, 30, 33, 60.) In fact, with respect to the evidence submitted in conjunction with the parties' summary judgment briefs, there are only two times in which race discrimination is even mentioned: first, Sledge alleges that he complained orally to Maupin in December of 2008 that he felt Groomes was discriminating against him because of his race (*see id.* at 26-28), and second, Sledge's EEOC Intake Questionnaire—titled "Amendment" and filed on November 9, 2009, subsequent to Sledge's March 2009 formal charge of disability discrimination—included "race" as one of the checked bases for Sledge's previously initiated discrimination and retaliation proceedings. Given the overwhelming evidence that Sledge's primary complaint and concern was about the discrimination that he believed Groomes was subjecting him to on the basis of his disability, Sledge has only the thinnest of reeds upon which to base his claim that he was retaliated against because of his engagement in a "protected activity" for the purpose of Title VII. *See McGrath*, 666 F.3d at 1382; *Branscomb*, 461 F. App'x at 906; *Omogbehin*, 485 F. App'x at 611.

Because Sledge's Title VII retaliation claim is properly based on only the two complaints of race discrimination that are supported by the record, this Court's analysis of the viability of Sledge's claim must relate solely to those two complaints. This narrows sufficiently Sledge's contentions regarding the adverse actions he suffered, given that (a) only certain MPD acts followed the race discrimination complaints temporally, (b) not all of these MPD acts qualify as "adverse actions," and (c) the MPD has provided legitimate, non-retaliatory reasons for its employment-related actions and determinations.

Turning first to the MPD acts that allegedly were undertaken in retaliation for Sledge's two complaints of race discrimination, Groomes's administrative investigation meets the temporal test insofar as that investigation commenced in February of 2009, a few months after Sledge's alleged oral complaint of race discrimination to Maupin in December of 2008. With respect to Sledge's "Amendment" to the EEOC Questionnaire in November 9, 2009, Sledge points to the fact that he was subsequently transferred to a different district—which purportedly resulted in his loss of seniority and his having to work the undesirable midnight shift—and maintains that this MPD action should also be viewed as an adverse action taken in retaliation for his written charges. (Pl.'s Sledge Dep. at 23.) But this Court concludes, based on the record presented, that Sledge's late-November transfer is not sufficiently adverse to give rise to any viable retaliation claim stemming from that EEOC complaint.

It is well settled that a *lateral* transfer—*i.e.*, a reassignment in which an employee retains his rank and substantive responsibilities—is usually not an adverse employment action for Title VII purposes. *See Stewart v. Ashcroft*, 352 F.3d 422, 426

(D.C. Cir. 2003); *cf. Zelaya v. UNICCO Serv. Co.*, 733 F. Supp. 2d 121, 132 (D.D.C. 2010) (citation omitted) (noting that a lateral reassignment with a significant loss of benefits is materially adverse).  Generally speaking, the determination of whether or not a reassignment is a materially adverse action depends on "compar[ing] the position the plaintiff held before the transfer to the one he holds afterwards."  *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 607 (D.C. Cir. 2010).  If a reassignment results in "significantly diminished responsibilities[,]" it qualifies as an adverse action for retaliation purposes, *Zelaya*, 733 F. Supp. 2d at 132 (citations omitted), and so, too, does a reassignment in which the employee loses seniority, but only if the employee is more likely to lose his job or other tangible benefits of employment as a result of that loss of seniority.  *See, e.g.*, *id.* (transfer with loss of seniority was an adverse action where seniority was the sole factor in determining layoff order).  By contrast, courts in this district have found that a loss of seniority that merely results in "subjective dissatisfaction with working conditions," rather than a substantial change in responsibility or benefits, does not qualify as a materially adverse action, given that such a transfer does not pose a "risk[ ] [to] employment itself[.]"  *Zelaya*, 733 F. Supp. 2d at 132; *see, e.g.*, *Sims v. District of Columbia*, No. 12-625, 2014 WL 487062, at *7 (D.D.C. Feb. 6, 2014) ("[Being] required to temporarily work midnight shifts demonstrate[s] only 'less favorable assignments,' which, as the D.C. Circuit has explained, do not rise to the level of materially adverse actions for the purposes of sustaining a retaliation claim." (citing *Jones v. District of Columbia Dep't of Corr.*, 429 F.3d 276, 281 (D.C. Cir. 2005))).  Because Sledge has failed to establish that the November 2009 transfer posed a substantial risk to his employment or other benefits,

27

and because he has not alleged any other adversities that occurred after his "Amendment" to the EEOC form, his Title VII retaliation claim in this case rests solely on the alleged causal relationship between the race-discrimination complaint Sledge allegedly made to Maupin in December of 2008 and Groomes's subsequent administrative investigation and the discipline that followed.

As explained, *supra*, the District has asserted a legitimate, non-discriminatory reason for Sledge's having been investigated and disciplined in February and March of 2009; namely, that Sledge failed to meet the requirements of his job when he did not come to work to oversee three important investigations; did not know enough about the investigations to brief his supervisors adequately; and left the office without taking precautions to ensure that the priority tasks that had been assigned to him would be completed in his absence. (*See* Def.'s Mot. at 14-15.) Sledge does not deny these job-related deficiencies, and just as with Sledge's claim of race discrimination, he has offered no direct evidence of Groomes's motivation or that of any other MPD official "that would discredit [the MPD's proffered] reasons and show that the actions were retaliatory." *Baloch*, 550 F.3d at 1200 (citations omitted). Instead, Sledge bases his pretext contention on the timing of the disciplinary actions Groomes initiated, on certain comments Groomes allegedly made related to his demotion, and on such circumstantial evidence as the fact that other officers had not been disciplined as severely for a neglect of duty charge.

Simply stated, Sledge first contends that a jury could draw an inference of retaliation based solely on the timing of his report of race discrimination to Maupin and Groomes's subsequent actions. (*See* Pl.'s Opp'n at 24-25 ("Sledge complained about

[Groomes's] disparate treatment in December 2008 . . . [and a]lmost immediately after making [that] complaint[ ], . . . Sledge was investigated for alleged neglect of duty[.]").) When evaluating retaliation claims, "district courts in this circuit generally follow an informal 'three-month rule' for cases in which a plaintiff attempts to establish a prima facie case of retaliation based on temporal proximity alone." *Hamilton*, 666 F.3d at 1349. But a plaintiff in Sledge's circumstance (where the defendant has offered a legitimate non-discriminatory reason for its actions) has to do more than establish a prima facie case, and temporal proximity "[does] not, without more, provide sufficient evidence to show pretext." *Drewrey v. Clinton*, 763 F. Supp. 2d 54, 64 (D.D.C. 2011) (citing *Porter v. Fulham*, 601 F. Supp. 2d 205, 229 (D.D.C. 2009), *aff'd in part, rev'd in part on other grounds sub nom. Porter v. Shah*, 606 F.3d 809 (D.C. Cir. 2010)).

Sledge also attempts to satisfy the pretext requirement by pointing to two comments that Groomes allegedly made that Sledge argues reflect retaliatory animus. (*See* Pl.'s Opp'n at 26.) In June of 2009, Groomes purportedly told another officer that "if she ha[d] her way" she would make sure that Sledge was demoted. (Pl.'s Interrog. Resps. at 15.) Nine months later, in March of 2010, Groomes apparently also sent Maupin an email stating: "I heard [Sledge is] blaming you for the late correspondence. Get [internal investigation] numbers on him." (Pl.'s Sledge Dep. at 92-93.) There is nothing about the first comment that even hints at a retaliatory motive, much less provides any basis to infer that the real reason Groomes sought to demote Sledge was because he had complained to Maupin about Groomes's alleged race discrimination. As for the second statement, Sledge has not established that a comment Groomes made about Sledge more than a year after the allegedly retaliatory investigation is anything

other than a reflection of their clearly strained relationship, and he certainly has not demonstrated that the statement is any way related to Groomes's actions the previous year in a manner that would give rise to any reasonable inference that the investigation and discipline were not the result of Sledge's poor performance but instead were reprisal for Sledge's having engaged in protected activity.

Finally, Sledge contends that the fact that other officers were not disciplined as severely as he was is circumstantial evidence that the District's rationale is mere pretext. (*See* Pl.'s Opp'n at 24-25.) The use of such comparator cases to establish retaliation is subject to the same restrictions as explained above in the discrimination context; that is, the plaintiff must identify a "similarly situated employee outside of a protected class who committed comparable offenses but who was punished less severely by the same deciding official." *White*, 876 F. Supp. 2d at 70 (citation omitted); *see, e.g.*, *Battle v. Truland Systs. Corp.*, No. 12-106, 2014 WL 1045897, at *9 (D.D.C. Mar. 19, 2014) (rejecting plaintiff's comparator evidence on his retaliation claim because there was insufficient information about whether the proposed comparator held the same position as the plaintiff); *Burton v. Batista*, 339 F. Supp. 2d 97, 115 (D.D.C. 2004) (rejecting the plaintiff's comparator evidence on his retaliation claim because of evidence that the two were not "similarly situated"). Here, Sledge's proposed comparator evidence suffers from the same deficiencies addressed above, insofar as he has failed to establish that other officers are "similarly situated" to him, *see, supra*, Section III.A.2, and it fails for the same reason.

In sum, no reasonable jury could draw an inference of retaliation based on the timing of the disciplinary actions that Groomes initiated, Groomes's comments about

Sledge, or the circumstantial evidence regarding other officers' discipline, and Sledge has not asserted any other reasons to rebut Defendant's legitimate, non-discriminatory rationale for taking the adverse actions at issue here. Consequently, Defendant is entitled to summary judgment on Sledge's retaliation claim as a matter of law.

### C. Hostile Work Environment Claims (Counts I And II)

In conjunction with his race discrimination and retaliation claims, Sledge also contends that the MPD's actions with respect to him—including Groomes's investigation and the failure of other captains and commanders to respond to his repeated complaints about her—created a hostile work environment. (Compl. ¶¶ 64-99; *see also* Intake Questionnaire at 5.)[8] For the reasons that follow, Sledge has not produced sufficient evidence for a reasonable jury to find in his favor on his hostile work environment allegations.

1. Framework For Establishing A Hostile Work Environment Claim

Title VII not only prohibits discriminatory employment decisions that have tangible consequences, it "also prohibits an employer from subjecting its employees to discriminatory hostile or abusive work environments." *Byrd*, 807 F. Supp. 2d at 64 (citation omitted). To establish a hostile work environment claim against his employer, a plaintiff must demonstrate that (1) he is a member of a protected class; (2) he was subject to unwelcome harassment; (3) the harassment was on the basis of membership in a protected class; (4) the harassment unreasonably interfered with the plaintiff's work performance and created an intimidating, hostile, or offensive working

---

[8] Sledge has alleged a "hostile work environment" claim in two different counts of his complaint, maintaining that he was subjected to such an environment as a result of race discrimination (Count I) and retaliation (Count II). Because a defendant's alleged motivation is not a pertinent element of a hostile work environment claim, this Court sees no reason to evaluate Sledge's hostile work environment allegation separately for each count.

environment; and (5) the employer knew or should have known of the harassment and failed to prevent it. *See id.*; *Hunter v. D.C. Child & Family Servs. Agency*, 710 F. Supp. 2d 152, 157-58 (D.D.C. 2010). Significantly, ongoing acts of harassment only create a hostile work environment for Title VII purposes "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]" *Harris v. Forklift Systs., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted). In determining whether the alleged harassment qualifies as severe or pervasive, courts consider the frequency and severity of the conduct; whether it is physically threatening or humiliating as opposed to merely offensive; and whether it unreasonably interferes with the employee's work performance. *Id.* at 23; *see also Brooks v. Grundmann*, 748 F.3d 1273, 1276 (D.C. Cir. 2014) (citation omitted). Moreover, to be actionable, the conduct complained of must be both objectively and subjectively hostile or abusive. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).

Even when a plaintiff identifies workplace conduct that rises to the level of actionable harassment, it is clear that, in order to form part of the "same actionable hostile work environment claim[,]" incidents of harassment must be sufficiently related insofar as they "involve[ ] the same type of employment actions, occur[ ] relatively frequently, and [are] perpetrated by the same managers." *Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2011) (alterations in original) (internal quotation marks and citations omitted). In other words, the acts giving rise to a hostile work environment claim must be "part of the same unlawful employment practice, as opposed to being an

array of unrelated discriminatory or retaliatory acts." *Id.* at 1252 (internal quotation marks and citations omitted).  Additionally, "[c]ourts in this jurisdiction have routinely held that hostile behavior, no matter how unjustified or egregious, cannot support a claim of hostile work environment unless there exists some linkage between the hostile behavior and the plaintiff's membership in a protected class." *Na'im v. Clinton*, 626 F. Supp. 2d 63, 73 (D.D.C. 2009) (collecting cases); *see, e.g.*, *Baloch*, 550 F.3d at 1201 (affirming summary judgment for defendant on a hostile work environment claim because almost none of the employer's comments expressly focused on his race, religion, age, or disability); *Kline v. Springer*, 602 F. Supp. 2d 234, 243 (D.D.C. 2009) (granting summary judgment for defendant on a hostile work environment claim because none of the comments had any direct connection to the plaintiff's race or sex); *see also Chaple v. Johnson*, 453 F. Supp. 2d 63, 74 (D.D.C. 2006) (noting that "[i]t must be clear that the hostile work environment was the result of discrimination based on a protected status" (citation omitted)).  In other words, "many bosses are harsh, unjust, and rude[,]" and "[i]t is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination [or retaliation; o]therwise, the federal courts will become a court of personnel appeals." *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 107 (D.D.C. 2005) (internal quotation marks and citations omitted).

  2. <u>The Record Evidence Does Not Establish That Sledge Was Subjected To A Hostile Work Environment</u>

  Sledge contends that his workplace became a hostile work environment for Title VII purposes beginning in the spring of 2008 due to certain specific events:  (1) Groomes increased Sledge's workload in March of 2008; (2) Maupin denied Sledge's

request to attend a week-long training session in June of 2008; (3) Groomes instructed another officer to investigate Sledge in November of 2008 for failing to respond to a citizen's email; (5) Groomes "screamed, hollered[,] and humiliated" Sledge at two group meetings in January and February of 2009; and (6) Durham failed to take action in response to Sledge's complaints about Groomes throughout this time period. (*See* Pl.'s Interrog. Resps. at 18-20.)  More generally, Sledge maintains that a hostile work environment arose as a result of the MPD's "practice of imposing unjust discipline [and] initiating unwarranted Internal Affairs investigations" (Pl.'s Opp'n at 33), and that "Groomes took every opportunity, no matter how slight, to create a hostile work environment for" him.  (Pl.'s Opp'n at 32-33.)  Given the applicable legal standards, however, this Court concludes that there is no genuine issue of material fact regarding whether Sledge was subjected to a hostile work environment in violation of Title VII— for the reasons explained below, the record evidence demonstrates clearly that he was not.

First of all, not all of the incidents that Sledge points to can support a hostile work environment claim, nor are they all sufficiently related to one another to sustain a single hostile work environment charge.  One outlier is instantly obvious:  Durham's reported failure to investigate Sledge's complaints is an entirely different type of action than the extra scrutiny and harsher discipline that form the basis of Sledge's other hostile work environment allegations.  Consequently, Durham's alleged inaction is not properly considered part of the hostile work environment that Groomes, and to some extent Maupin, allegedly created.  *See Baird*, 662 F.3d at 1251.

The remaining incidents of purportedly abusive conduct generally involved the same decision-makers (Sledge's direct supervisors) and arguably more similar employment actions (*i.e.*, singling Sledge out); nevertheless, the Court concludes that these types of actions are simply not the stuff of which valid Title VII hostile work environment claims are made, for several reasons. First, Sledge has presented no evidence whatsoever that suggests any link between Groomes's allegedly hostile conduct and Sledge's race. For example, there is no allegation or evidence that Groomes's act of yelling at Sledge after Sledge failed to report for duty reflected a *racial* animus; indeed, Sledge has not recounted the contents of any of Groomes's statements at all. And this lack of any factual basis upon which to conclude that race played a role in Groomes's alleged mistreatment of Sledge is even more pronounced considering that the MPD has offered a legitimate, non-discriminatory rationale for Groomes's harsh tone, administrative investigation, and recommended discipline.

Second, and perhaps even more significant, the environment that Sledge allegedly faced during the relevant timeframe was not sufficiently "severe or pervasive" to qualify as a hostile work environment. For example, Sledge claims that Groomes "humiliated" him during two group meetings in January and February of 2009 (*see* Pl.'s Interrog. Resps. at 18), but there is no evidence that alleged humiliation continued beyond those two meetings, nor has Sledge established with evidentiary support that Groomes's alleged "screaming" was objectively humiliating. As noted above, Sledge has not even provided allegations or evidence regarding the language Groomes allegedly used, much less established that a reasonable jury could find the sort of "extreme" conduct required. *See Akosile v. Armed Forces Retirement Home*, 938 F.

Supp. 2d 76, 87 (D.D.C. 2013) ("Negative interactions with supervisors, even when a supervisor yells and uses profanity, generally do not meet [the hostile work environment] standard." (citing *Baloch*, 550 F.3d at 1201)).

Moreover, Sledge does little to offer evidentiary support for his contention that he faced a hostile work environment due to the additional unwarranted scrutiny. As explained, a work environment is sufficiently hostile only if the harassing treatment objectively "alter[s] the conditions" of a plaintiff's employment. *See Harris*, 510 U.S. at 21 (citation omitted). Consequently, courts in this district have declined to find a hostile work environment where employees faced circumstances that were even more taxing than those Sledge faced here. *See, e.g.*, *Williams v. Spencer*, 883 F. Supp. 2d 165, 180-81 (D.D.C. 2012) (finding no hostile work environment where a supervisor persistently ignored and humiliated an employee during staff meetings, gave the employee an unwarranted negative performance review, placed burdensome requirements on the employee, did not give the employee an opportunity to improve her performance, and then, unfairly disciplined the employee by charging her as absent-without-leave while she attended a doctor's appointment); *see also, e.g.*, *Baloch*, 550 F.3d at 1201 (affirming finding of no hostile work environment where the plaintiff's supervisor repeatedly criticized him and gave him a negative review, imposed leave restrictions, engaged in verbal altercations with the plaintiff using profanity, and threatened to have the plaintiff arrested); *Hussain v. Nicholson*, 435 F.3d 359, 366-67 (D.C. Cir. 2006) (affirming summary judgment for defendant on hostile work environment claim because no reasonable jury could find a hostile work environment based on a denial of promotion, denial of medical leave, poor performance evaluations,

and threats of termination). Furthermore, where, as here, the employer has provided legitimate reasons for the discipline, there is even less of a factual basis upon which to conclude that the established "hostile work environment" standards are satisfied. *See Harris*, 510 U.S. at 21.

In short, the "ordinary tribulations of the workplace" reflecting an employee's difficult relationship with a supervisor are not actionable under Title VII, *Faragher*, 524 U.S. at 788 (citation omitted), and in this case Sledge has demonstrated nothing more. Therefore, the District is entitled to summary judgment on Plaintiff's hostile work environment claims.

### D. Section 1983 Claim (Count IV)

Lastly, Sledge contends that the District is liable under Section 1983 of Title 42 of the United States Code for violations of his Fifth Amendment right to equal protection and his rights under Title VII based on the MPD officers' alleged race discrimination and unlawful retaliation. (Compl. ¶¶ 111-121.) Sledge's Section 1983 claim is against the District, rather than against any particular MPD officer; hence, it is a municipal liability claim. *See Monell v. N.Y. Dep't of Soc. Servs.*, 436 U.S. 658, 695 (1978); *Best v. District of Columbia*, 743 F. Supp. 44, 46 (1990) (citation omitted). Defendant is entitled to summary judgment on this claim because, even if the evidence in this matter supported an inference that MPD officers discriminated against Sledge on the basis of his race or retaliated him in violation of Title VII (it does not), Sledge has not demonstrated any basis for municipal liability.

1. <u>Legal Framework For A Section 1983 Claim Brought Against A Municipality</u>

A prima facie case under Section 1983 requires a showing that a person acting under the color of state law caused a deprivation of a constitutional right or federal law. *Monell*, 436 U.S. at 690-91. Under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 683 (1978), a municipality may be liable for such deprivations only if, first, the plaintiff establishes an underlying violation of the Constitution or other federal law; and second, the plaintiff demonstrates that a basis for municipal liability exists. *See Brown v. District of Columbia*, 514 F.3d 1279, 1283 (D.C. Cir. 2008) (citation omitted); *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (citation omitted).

With respect to the second prong of this *Monell* municipal liability test, the Supreme Court has made clear that *respondeat superior* (or vicarious liability) is not enough. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell*, 436 U.S. at 694-95). Instead, a city can be held liable under Section 1983—either directly or in its role as a supervisor of the employees who undertake unconstitutional actions—only when its *own* "policy or custom[ ] . . . inflicts the injury[.]" *Monell*, 436 U.S. at 694. "There are four basic categories of municipal action [a p]laintiff may rely on to establish municipal liability:  (1) express municipal policy; (2) adoption by municipal policymakers; (3) custom or usage; and (4) deliberate indifference." *Hunter v. District of Columbia*, 824 F. Supp. 2d 125, 133 (D.D.C. 2011) (citing *Monell*, 436 U.S. at 690-94). In addition, to establish municipal liability, the court "must determine whether the plaintiff has alleged an affirmative link, such that a municipal policy was the moving

force behind the constitutional violation[.]" *Baker*, 326 F.3d at 1306 (internal quotation marks and citations omitted).

### 2. Sledge Has Failed To Establish A Basis For Municipal Liability

In this case, Sledge's Section 1983 claim fails because he likely cannot satisfy either prong of *Monell*'s test for municipal liability under Section 1983, and he certainly fails to satisfy the second. With respect to the first prong, as described in detail above, no reasonable jury could conclude that Sledge was discriminated against on the basis of his race, or that his supervisor retaliated against him or subjected him to a hostile work environment due to race in violation of his rights under Title VII. *See* Sections III.A.2, III.B.2, III.C.2, *supra*. It is also highly unlikely that, having failed to establish an actionable Title VII discrimination or retaliation claim, Sledge would be able to show that the MPD intentionally treated him differently from others similarly situated without a rational basis, as required to sustain a Fifth Amendment equal protection claim. *See Jo v. District of Columbia*, 582 F. Supp. 2d 51, 60 (D.D.C. 2008) ("Courts in this district have often applied Title VII case law to review claims of discrimination [in violation of the Fifth Amendment] under [Section] 1983 to determine whether a plaintiff has established a predicate constitutional violation." (collecting cases)).

But even if Sledge could establish the predicate violation and thus could successfully mount the first *Monell* hurdle, he has fallen far short of having adduced sufficient evidence to establish a basis for the District's liability. The record reflects that the allegedly discriminating actors in this case are individual officers who were generally acting on their own accord under color of state law. In the complaint, Sledge specifically alleged municipal liability based on *respondeat superior* liability for the

officers' conduct (*see* Compl. ¶ 119 ("Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.")), but as noted above, it is well settled that municipal liability does not lie on this basis.

None of the other routes to municipal liability are available here, either. There is no evidence that the officers mistreated Sledge pursuant to some sort of municipal policy, whether express or implied through custom. *See Hunter*, 824 F. Supp. 2d at 133. Nor is there evidentiary support for Sledge's newly-minted claims of deliberate indifference. (*See* Pl.'s Opp'n at 36 (contending that "the evidence establishes a deliberate indifference standard" of liability because "Sledge complained of misconduct" and Defendant "refused to investigate any of his complaints").) Deliberate indifference liability occurs when a municipality knew or should have known of a risk that the complained-of violation would occur, but did nothing to prevent that violation. *Baker*, 326 F.3d at 1306-07. This theory mandates a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011) (quoting *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)). The alleged unconstitutional conduct must be "pervasive enough to be 'so common and settled' as 'to be considered a custom or policy.'" *Jones v. District of Columbia*, 879 F. Supp. 2d 69, 86 (D.D.C. 2012) (citing *Carter v. District of Columbia*, 795 F.2d 116, 125 (D.C. Cir. 1986)); *see also Poindexter v. D.C. Dep't of Corrections*, 891 F. Supp. 2d 117, 121 (D.D.C. 2012) (a plaintiff may prove deliberate indifference by, among other things, demonstrating that the "municipality adopt[ed] a policy of inaction when faced with

actual or constructive knowledge that its agents will likely violate constitutional rights," and by showing that the policy was the driving force behind the challenged conduct).  Moreover, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*," *City of Okla. City v. Tuttle*, 471 U.S. 808, 823-34 (1985), and "[s]imply citing to [plaintiff's] own experiences" does not demonstrate that a plaintiff was "the victim of a policy or custom that caused them to suffer injury." *Jones*, 879 F. Supp. 2d at 87; *Sanders v. District of Columbia*, 522 F. Supp. 2d 83, 88 (D.D.C. 2007) (dismissing plaintiff's First Amendment retaliation claims under Section 1983 where the plaintiff did not "point[ ] to any other employee who suffered similar retaliation").

*DuBerry v. District of Columbia*, 582 F. Supp. 2d 27 (D.D.C. 2008), is instructive on this point.  The court in that case granted summary judgment to defendant on plaintiff's claim that the District of Columbia violated his Fifth Amendment rights by engaging in race discrimination when his employer, the D.C. Department of Corrections ("DOC"), fired him then refused to rehire him.  *Id.* at 39.  The plaintiff argued that because DOC officials were aware of and approved those allegedly discriminatory employment decisions, the District could be held liable.  *Id.*  The court disagreed, noting that plaintiff had failed to establish a basis for municipal liability because he had "not produced any evidence that [DOC's] alleged discriminatory employment practices impacted a single employee . . . other than himself[,]" and thus the conduct alleged did not reflect a policy or custom.  *Id.*

So it is here.  In support of his argument for deliberate indifference liability, Sledge cites only his own reports of discriminatory and retaliatory misconduct, and the

MPD's failure to investigate those reports.  (*See* Pl.'s Opp'n at 36 (record citations omitted).)  Like *DuBerry*, Sledge has not produced any evidence that the MPD had developed a practice of ignoring allegations related to discriminatory treatment by its employees, and indeed, Sledge has not identified any other similar reports that the District allegedly ignored.  At bottom, there is no evidence that the MPD has a custom, practice, or policy of deliberately ignoring complaints alleging discrimination or retaliation on the basis of race.  Accordingly, Sledge has failed to establish that Defendant is liable for the allegedly discriminatory and retaliatory acts of its officers.

Undaunted, Sledge contends in the alternative that he need not establish a basis for municipal liability at all because courts in this circuit do not require a plaintiff to do so when they allege a Section 1983 claim based on a Title VII violation.  (*See id.* at 35.)  This argument is mistaken.  While Sledge is correct that courts apply Title VII case law to address *Monell*'s first prong—*i.e.*, whether there has been employment discrimination in violation of the Constitution or a federal law—it is clear beyond cavil that a successful plaintiff is still required to satisfy *Monell*'s second prong.  *See, e.g.*, *Olatunji v. District of Columbia*, 958 F. Supp. 2d 27, 34-35 (D.D.C. 2013) (requiring the plaintiff to establish a basis for municipal liability on a Section 1983 employment discrimination claim); *Motley-Ivey v. District of Columbia*, 923 F. Supp. 2d 222, 238-39 (D.D.C. 2013) (same); *DuBerry*, 582 F. Supp. 2d at 39 (same); *Turner*, 383 F. Supp. 2d at 166 (same).  Sledge has failed to meet this requirement.  Therefore, the District is also entitled to summary judgment on Sledge's Section 1983 municipal liability claim.

**IV.    CONCLUSION**

For the foregoing reasons, the Court concludes that Defendant's motion for summary judgment must be **GRANTED**.  Accordingly, as set forth in the accompanying order, judgment will be entered in favor of Defendant on all claims.

DATE:  August 6, 2014                              *Ketanji Brown Jackson*
                                                  KETANJI BROWN JACKSON
                                                  United States District Judge